IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR.NO. 2:18-cr-00249-WKW-WC |
| | ) | [18 U.S.C. § 371; |
| WILLIAM E. HENRY, | ) | 18 U.S.C. § 1349; |
| a/k/a "Ed," | ) | 18 U.S.C. § 1347; |
| PUNURU J. REDDY, | ) | 18 U.S.C. § 1956; |
| NICOLE D. SCRUGGS | ) | 42 U.S.C. § 1320a-7b; |
| | ) | 18 U.S.C. § 2] |
| | ) | |
| | ) | SUPERSEDING INDICTMENT |

The Grand Jury charges:

## I. BACKGROUND

1.      From an unknown date and continuing until in or about August of 2017,

Gilberto Sanchez was a primary care physician licensed to practice medicine in Alabama.  On

or about November 28, 2017, Sanchez pleaded guilty to: (1) conspiring to distribute controlled

substances, in violation of Title 21, United States Code, Section 846; (2) health care fraud, in

violation of Title 18, United States Code, Section 1347; and (3) money laundering, in violation

of Title 18, United States Code, Section 1957(a).  Sanchez is not charged in this Superseding

Indictment.

2.      From an unknown date and continuing until in or about 2013, Sanchez was a co-

owner of a medical practice located at and near 4143 Atlanta Highway, Montgomery,

Alabama.  The practice's legal name was "Shepherd A Odom, MD, PC."  However, the

practice operated under the name "Family Practice."  From in or about 2013 through in or

about 2017, Sanchez was the sole owner of Family Practice.

3.      From an unknown date and continuing until on or about August 1, 2017,

Sanchez practiced primary care medicine at Family Practice. During that period, Sanchez employed other primary care providers (consisting of physicians and certified registered nurse practitioners) who also practiced family medicine at Family Practice. The practice, through its various physicians and certified registered nurse practitioners, provided primary care to over 9,000 unique patients. On a monthly basis, Family Practice was among the busiest primary care practices in the Montgomery area.

4.     From an unknown date and continuing through the present, Defendant Punuru J. Reddy was an internal medicine physician licensed to practice medicine in Alabama. Reddy owned and was the primary physician practicing in an internal medicine practice in Decatur, Alabama. The name of that practice was P.J.M. Reddy, M.D., Inc. (Reddy Practice).

5.     From an unknown date and continuing through the present, Defendant Nicole D. Scruggs was an internal medicine physician licensed to practice medicine in Alabama. Scruggs owned and was the primary physician practicing in an internal medicine practice in Huntsville, Alabama. The name of that practice was Legacy Medical Care, LLC (Legacy Medical).

6.     From an unknown date and continuing through the present, Defendant William E. Henry, a/k/a "Ed," was a resident of Hartselle, Alabama. From in or about 1997 through in or about 2002, Henry worked for an international appliance manufacturer as a medical device sales representative. From in or about 2002 through in or about 2015, Henry worked for various health care facilities as a radiology technician.

7.     In or about July of 2015, by filing documents with the Alabama Secretary of State in Montgomery and elsewhere, Defendant Henry formed a corporation for the purpose of providing services to primary care physicians. Henry's partner in this venture was G.C., a

2

resident of Decatur.

## II. INTRODUCTION

### A. Background on Medicare Programs

8. The factual allegations contained in paragraphs 1 through 7 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

9. At all times material to this Superseding Indictment, the Centers for Medicare and Medicaid Services (CMS) was a federal agency within the United States Department of Health and Human Services. CMS administered various government-funded health care programs. These programs provided health care benefit items and services to over 100,000,000 beneficiaries.

10. At all times material to this Superseding Indictment, the Medicare program (Medicare) was a federal health care program administered by CMS. Medicare provided health care benefit items and services to beneficiaries who were age 65 or older or who were disabled. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

11. At all times material to this Superseding Indictment, Medicare Part B was a medical insurance program available to Medicare beneficiaries. Medicare Part B paid for health care items and services furnished to beneficiaries on outpatient bases. Among the items and services covered by Medicare Part B were outpatient physician services, diagnostic tests, vaccinations, and outpatient hospital procedures. Medicare Part B was optional for Medicare beneficiaries. To be enrolled in Medicare Part B, a beneficiary was required to pay a monthly premium.

3

12.     At all times material to this Superseding Indictment, CMS required that Medicare Part B beneficiaries pay deductibles and copayments (commonly referred to as "copays"). A deductible was the amount that a Medicare Part B beneficiary must pay in a calendar year before CMS would pay for any items or services for that individual. In 2016, the annual Medicare Part B deductible was $166. In 2017, the annual Medicare Part B deductible was $183. A copay was the portion of the cost of an item or service that the Medicare Part B beneficiary was required to pay (after the beneficiary had paid his or her deductible). Generally, the Part B copay was 20 percent of the reasonable charge for an item or service. Accordingly, if a reasonable charge for an item or service was $100, then CMS would reimburse the provider $80 and the beneficiary would be required to pay the provider the remaining $20.

13.     At all times material to this Superseding Indictment, CMS paid health care providers for Medicare Part B services on a charge basis. Under Title 42, United States Code, Section 1395u(b)(3), CMS would pay "reasonable charges" for services. Determination of a reasonable charge for a service included an examination of: (1) the actual charge for the item or service; (2) the customary charge for the item or service; and (3) the prevailing charge for the item or service in the same locality. The reasonable charge could never exceed the actual charge, and generally could never exceed the customary charge or the prevailing charge. The actual charge consisted of the amount that the provider charged CMS plus the amount that the provider collected from a patient as a copay.

14.     On or about January 1, 1992, CMS issued the Medicare Physician Fee Schedule (MPFS). The MPFS consisted of a list of approximately 7,000 services for which providers could submit bills under the Medicare Part B program.

4

**B. The Anti-Kickback Statute**

15. The factual allegations contained in paragraphs 1 through 14 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

16. The Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), prohibits knowingly and willfully offering, paying, soliciting, or receiving a kickback or bribe to induce or reward referrals or the arranging for referrals of items or services reimbursable by a Federal health care program. The Anti-Kickback Statute attaches criminal liability to parties on both sides of an impermissible "kickback" transaction. In doing so, it ensures that patient care is based on what is best for the patient and not upon the financial interest of the person or entity making or arranging for, or receiving the referral.

**C. Copay Waivers as Kickbacks and Health Care Fraud**

17. The factual allegations contained in paragraphs 1 through 16 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

18. In or about May of 1991, CMS issued a "special fraud alert" bulletin. In that bulletin, CMS informed health care providers that routinely failing to collect copays from patients: (1) could be considered a violation of the Anti-Kickback Statute, set forth at Title 42, United States Code, Section 1320a-7b(b); and (2) could be considered health care fraud, in violation of Title 18, United States Code, Section 1347.

19. As for copay waivers as kickbacks, CMS stated that the systematic waiver of copay obligations could result in the over-utilization of covered services. CMS required that providers collect copays so as to dis-incentivize beneficiaries from accepting unnecessary services from providers. Thus, when a physician waived a copay obligation, the physician, functionally, paid the beneficiary an amount of money equal to 20 percent of the reasonable charge for the covered item or service. In exchange, the patient agreed to order a covered item

5

or service. As a result, a patient would not be financially deterred from accepting or ordering an unnecessary item or service.

20. As for copay waivers as health care fraud, CMS stated that the waiver of copays could cause CMS to reimburse at a higher rate than it otherwise would. This is so because, as noted, CMS considered the "actual charge" when determining the reimbursement rate. If a provider submitted a claim for a covered item or service and did not inform CMS that the provider had not collected a copay, then the provider overstated the actual charge by 20 percent. For example, if a provider submitted a claim for a $100 service and failed to disclose the waiver of a copay obligation, then CMS would pay the provider $80, equal to 20 percent of the actual charge. However, had the provider informed CMS that the provider had waived the copay obligation, then CMS would have only paid the provider $64, equal to 20 percent of the actual charge, taking into account the waiver of the copay obligation.

21. CMS did acknowledge that a provider could decline to collect a copay when a patient was indigent and had a legitimate medical need for an item or service. CMS stated that such need-based copay waivers were to be sporadic and not systematic. Moreover, providers waiving copays based on indigence were instructed to document, in the patients' medical records, the specific reasons for waiving the copay obligations.

**D. Chronic Care Management**

22. The factual allegations contained in paragraphs 1 through 21 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

23. On or about January 1, 2015, CMS began reimbursing providers for chronic care management services provided to certain Medicare Part B beneficiaries. It did so by adding chronic care management to the MPFS. CMS defined chronic care management as non-face-

6

to-face care coordination services provided to patients on monthly bases. CMS instructed health care professionals to use the Current Procedural Terminology (CPT) code "99490" when submitting claims for at least 20 minutes of non-complex chronic care management services.

24.     At all times material to this Superseding Indictment, to be eligible for chronic care management services, a Medicare Part B beneficiary had to be enrolled by a provider in a chronic care management program. Beneficiaries eligible for such programs were beneficiaries who: (1) had two or more chronic conditions expected to last at least 12 months or until the beneficiary's death; (2) were at risk of death, acute exacerbation or decompensation, or functional decline due to the chronic conditions; and (3) had an established, implemented, and monitored comprehensive care plan.

25.     Once a Medicare Part B beneficiary was enrolled in a chronic care management program, a provider could bill CMS for providing at least 20 minutes of chronic care management services to the patient during a calendar month. To do so, the provider was to place, on a claim, the 99490 CPT code. CMS required that chronic care management services be provided by a physician or a clinical staff person under the direction of the billing practitioner. Examples of chronic care management services included non-face-to-face medical consultations (either through telephone calls or emails), arranging appointments with specialists, calling in prescription refills, and monitoring and updating the comprehensive care plan.

26.     At all times material to this Superseding Indictment, the reasonable charge for the CPT code 99490, signifying at least 20 minutes per month of chronic care management services provided to a beneficiary, was approximately $40. Under this arrangement, CMS

paid a provider approximately $32 per beneficiary per month for chronic care management services provided to that beneficiary during the previous month. A provider was responsible for collecting an $8 copay from the beneficiary. Moreover, CMS did not reimburse providers for chronic care management services provided to a beneficiary who had not met his or her annual deductibles at the time the provider submitted the claim.

27.     From in or about January of 2015 until in or about January of 2017, CMS required that a provider obtain a beneficiary's signed consent before enrolling the beneficiary in a chronic care management program. In obtaining the signed consent, CMS mandated that the provider inform the beneficiary of the deductible and copay costs associated with the service. After in or about January of 2017, CMS permitted providers to enroll beneficiaries by obtaining a beneficiary's oral consent to enter a chronic care management program. However, even after that change, CMS still required providers to inform beneficiaries of the potential out-of-pocket costs associated with chronic care management.

28.     At all times material to this Superseding Indictment, various business entities offered to provide chronic care management services to physicians on outsourced bases. These third-party chronic care management providers entered into contracts with physicians and medical practices. Pursuant to those contracts, the third-party providers accessed the physicians' or practices' electronic health records. The third-party providers then used the information in those records to contact Medicare Part B beneficiary patients whom the physicians had enrolled in chronic care management programs.

29.     During those contacts, most of which were telephonic, the clinical staff persons employed by the third-party providers counseled the beneficiaries on caring for the beneficiaries' chronic conditions. The clinical staff persons employed by the third-party

providers also developed and monitored comprehensive care plans for the beneficiaries. Most third-party providers operated in locations remote from the facilities of the physician or practice with whom the providers contracted. Some third-party providers embedded clinical staff persons within the office space of the physician or practice. In such instances, the embedded clinical staff persons generally assisted the physicians in enrolling beneficiaries in chronic care management programs.

## III. FAMILY PRACTICE COUNTS

**A.  Conspiracy and Anti-Kickback Statute Violation Counts**

<u>COUNT 1</u>
(Conspiracy to Defraud the United
States and to Pay and Receive Kickbacks in
Connection with a Federal Health Care Program)

30.  The factual allegations contained in paragraphs 1 through 29 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

31.  Beginning in or about July of 2015 and continuing through in or about June of 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

WILLIAM E. HENRY,
a/k/a "Ed,"

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown, including Sanchez, to commit offenses against the United States in violation of Title 18, United States Code, Section 371, and Title 18, United States Code, Section 1320a-7b(b).

OBJECTS OF THE CONSPIRACY

32.  It was an object of the conspiracy to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful

9

government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371.

33.     It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

34.     It was an object of the conspiracy to violate Title 42, United States Code, Section 1320-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

35.     It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## MANNER AND MEANS

36.     The manner and means used to accomplish the objectives of the conspiracy

10

included, among others, the following.

37.     In or about early 2015, Sanchez, on behalf of Family Practice, entered into a contract with Company A. Under that contract, Company A was to provide chronic care management services to Medicare Part B beneficiaries who were patients of the medical providers employed by and associated with Family Practice and who were enrolled in a chronic care management program created by Sanchez and Family Practice.

38.     Under that contract, Company A would charge Family Practice approximately $22.60 per beneficiary per month for whom Company A provided at least 20 minutes of chronic care management services during the preceding month. Company A would charge Family Practice this amount for every patient, regardless of whether and to what extent CMS reimbursed for services provided to a particular patient.

39.     Before Company A began providing chronic care management services for patients of Family Practice, during in or about the spring of 2015, Sanchez and individuals working for him enrolled patients in the practice's chronic care management program. In doing so, Sanchez and those working for him failed to inform the patients of the potential for out-of-pocket costs resulting from the receipt of chronic care management services.

40.     Once Sanchez and others had enrolled the patients, during in or about the spring of 2015, employees of Company A began providing chronic care management services to the enrolled Medicare Part B beneficiary patients of Family Practice. During telephonic conversations, clinical staff persons employed by Company A and acting under contract with Family Practice reminded beneficiaries of the beneficiaries' obligations to pay deductibles and copays for chronic care management services. The enrolled beneficiaries, unaware of the possibility for out-of-pocket costs stemming from their being in the chronic care management

11

program, then contacted Sanchez and employees of Family Practice. During these contacts, the beneficiaries complained about the fact that Sanchez and those doing enrollment had not informed the patients of the possibility of out-of-pocket costs. These patients then asked to be dis-enrolled from the program.

41.     After receiving these complaints from patients, Sanchez desired to terminate his arrangement with Company A.

42.     Meanwhile, Defendant Henry created a new company, My Practice24, Inc. The articles of incorporation listed Henry and others as directors of MyPractice24. Henry created MyPractice24 for the purpose of providing chronic care management services to Medicare Part B beneficiaries through contracts with physicians and medical practices.

43.     In or about December of 2015, Defendant Henry approached Sanchez about MyPractice24 entering into a contract with Family Practice to provide chronic care management services. Henry offered the following terms to Sanchez: (1) MyPractice24 would charge Family Practice a substantially lower rate, to wit, $18 per patient per month, than the rate of $22.60 per patient per month Company A was charging Sanchez; (2) due to this reduced rate, Family Practice would be able to afford to waive copay obligations for all patients who did not have secondary insurance providers, regardless of whether a patient was actually indigent or otherwise could not afford the approximately $8 per month copay; and (3) MyPractice24 would only bill Family Practice for services that were fully or partially reimbursed by CMS, regardless of whether MyPractice24 was or was not responsible for the non-payment for a service. As for this last term, for example, if a patient had not yet met his or her deductible for a year and thus CMS did not pay for services provided to that patient, Henry would not bill Sanchez for the provision of services to that patient. Thus, Sanchez

12

would not be required to collect deductibles from patients, and he would typically receive approximately $14 per patient after receiving reimbursement from CMS and paying MyPractice24's fee.

44. Henry further proposed that, each month, employees of his company would send to the Family Practice billing office a list of patients for whom MyPractice24 had provided at least 20 minutes of chronic care management services during the previous month. The billing office would use that list to submit claims to CMS. In submitting these claims, the billing office would use the 99490 CPT code and thus falsely report the actual charge as including the copays. Doing so would cause CMS to wrongly conclude that Family Practice had collected the copays. In fact, Family Practice would not have, in most instances, collected the copays. Sanchez accepted all of Henry's terms.

45. In or about March of 2016, MyPractice24 employees began to provide chronic care management services to Medicare Part B beneficiary patients who were enrolled in the Family Practice chronic care management program. At this time, MyPractice24 did so through the use of clinical staff persons operating remotely from the Family Practice clinic in Montgomery. Accordingly, Sanchez and those working for him were responsible for enrolling new patients in the chronic care management program.

46. In or about March of 2016, Sanchez introduced Defendant Henry to an employee of an employee of Company B, a third-party entity to whom Sanchez referred patients for laboratory testing. Sanchez did so pursuant to a kickback arrangement that he entered into with Company B and Company B's principals. The employee of Company B worked on site at Family Practice in space that Company B leased from Family Practice. The employee was C.U., a trained phlebotomist. Under the kickback arrangement between

13

Sanchez and Company B, Sanchez and the other medical providers employed by and associated with Family Practice delegated to C.U. the authority to refer patients for laboratory testing and other health care items and services for which reimbursement may be made by a health care benefit program. Chronic care management was a health care item for which C.U. could refer patients, based on referral authority delegated to her by Sanchez and the other medical providers.

47.     Henry informed C.U. that he (Henry) needed someone on site at Family Practice referring patients to the chronic care management program. Henry asked C.U. to be that person. He offered to pay her $1 per month for each Medicare Part B beneficiary patient for whom MyPractice24 was able to bill Family Practice for providing chronic care management services during the previous month. Henry did not make C.U. an employee or independent contractor of MyPractice24. In short, Henry offered to pay C.U. monetary kickbacks in exchange for C.U. referring Family Practice patients to MyPractice24 for chronic care management. C.U. accepted this offer.

48.     Defendant Henry then instructed C.U. on what to say when recruiting patients for Family Practice's chronic care management program. Specifically, Henry advised that, if a patient asked about the potential for out-of-pocket costs, C.U. should respond by informing the patient that Sanchez desired for the patient to be in the program and thus Sanchez was willing to waive copay obligations if patients did not have secondary insurance. C.U. followed these instructions.

49.     Between in or about March of 2016 and in or about October of 2016, Defendant Henry, Sanchez, and C.U. executed this arrangement. That is, MyPractice24 charged Family Practice $18 per patient per month. In light of this below-market rate, Family Practice, at

Sanchez's direction, did not collect copays from patients without secondary insurance. Henry knew that Sanchez and the Family Practice employees were waiving copay obligations. Henry paid C.U. monthly kickbacks in return for C.U. referring patients to the program.

50.    In or about October of 2016, C.U. lost her position with Company B. C.U. asked Sanchez for a position working directly for Family Practice. Sanchez declined. Sanchez asked Defendant Henry to hire C.U. Henry conditionally agreed to do so. Henry stated that he would do so only if Sanchez agreed to increase Family Practice's rate to $20 per patient per month, which would result in Sanchez receiving approximately $12 per patient after CMS reimbursed him and he paid MyPractice24's fee. Sanchez agreed to this condition. Henry then hired C.U. to provide CCM services to patients of Family Practice who were enrolled in the chronic care management program.

51.    Thereafter, MyPractice24 employees trained C.U. on how to provide chronic care management services. During such training, the MyPractice24 employees instructed C.U. to make sure to spend at least 20 minutes each month providing chronic care management services to each enrolled patient. C.U. then began to make telephone calls to enrolled beneficiary patients and to otherwise provide chronic care management services to those enrolled. C.U operated out of space located at Family Practice.

52.    After starting to work for MyPractice24, with Defendant Henry's permission, C.U. did occasional patient triage work for Sanchez and the Family Practice employees. Such work was unrelated to C.U.'s work for MyPractice24. Neither Sanchez nor Family Practice compensated C.U. for this work. C.U. received all of her compensation from MyPractice24.

53.    In or about December of 2016, Defendant Henry instructed C.U. that she was to assume responsibility for submitting claims to CMS, on behalf of Family Practice, for chronic

15

care management services. Henry did so because he was frustrated that the Family Practice billing office was operating too slowly in submitting the claims to CMS. C.U. then met with the employees of the Family Practice billing office and learned how to submit claims to CMS using the Family Practice computer software. After undergoing this training, C.U. assumed responsibility for preparing claims to be submitted to CMS for chronic care management services. C.U. used the 99490 CPT code for all chronic care management claims. At the direction of Henry, she falsely reported the actual charges as including the collection of the copays. Generally, no copays had been collected.

54. In or about January of 2017, Defendant Henry instructed C.U. to refrain from submitting claims to CMS on behalf of Family Practice until April or May of 2017. He gave her this instruction so as to allow time for beneficiaries to meet their annual deductibles on other covered items or services. Henry did not want the Medicare Part B beneficiary patients to have to pay their deductibles on chronic care management services. Henry expected that patients would be unwilling to pay out-of-pocket for the full cost of chronic care management. C.U. complied with this instruction. In turn, until June of 2017, Henry refrained from invoicing Family Practice for chronic care management services.

55. In or about March of 2017, Sanchez informed Defendant Henry that he (Sanchez) thought that he could more cheaply provide chronic care management services through other means. Accordingly, Sanchez gave 90 days' notice that he wished to cancel his contract with MyPractice24. In or about June of 2017, the contract ended. At that time, Henry submitted all of the invoices for work performed by MyPractice24 from January of 2017 to June of 2017. The invoices submitted did not include any interest charges for the period during which MyPractice24 had deferred billing.

16

56.     In summary, Defendant Henry and his co-conspirators conspired to and did impair, impede, obstruct, and defeat through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, by: (1) waiving copays for chronic care management services, thus creating the potential that patients obtained unnecessary services; and (2) submitting claims to CMS for chronic care management services that falsely reflected the actual charges for the chronic care management services. The claims were false in that they included, in the actual charges, the amount to be paid by the patients as copays. As Henry and the co-conspirators then knew, Family Practice was not collecting copays. These false claims induced CMS to pay more for the chronic care management services described in the claims than CMS would have paid had it known that the copays had been systematically waived.

57.     In summary, Defendant Henry and his co-conspirators conspired to and did knowingly and willfully offer and pay and solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare. The kickbacks paid by Henry and received by Sanchez and others affiliated with Family Practice to induce the referral of patients of Family Practice to MyPractice24 for chronic care management services reimbursable by Medicare included: (1) the payments to C.U., the employee of the contractor of Family Practice, of $1 per Medicare Part B beneficiary patient per month for which MyPractice24 was able to bill Family Practice for providing chronic care management

17

services; (2) MyPractice24's deferral of submitting invoices to Family Practice from January of 2017 through June of 2017, so as to allow Family Practice to defer the submission of claims to CMS until after beneficiaries had paid their deductibles on other services; (3) the hiring of C.U. at Sanchez's request and Henry's allowing C.U. to do work for Family Practice unrelated to chronic care management; and (4) the non-invoicing for services rendered when CMS did not reimburse for such services, even if MyPractice24 was not at fault for CMS's decision to not pay a claim and even if payment in full could have been obtained from a patient who owed a deductible.

58. In summary, Defendant Henry and his co-conspirators conspired to and did knowingly and willfully offer and pay and solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare. The kickbacks paid by Sanchez, Henry's co-conspirator, and received by the patients of Family Practice for the purchasing and ordering of chronic care management services reimbursable by CMS included the systematically waived copay obligations for patients who did not have secondary insurance. Henry facilitated Sanchez's doing this by charging Sanchez a below-market rate for chronic care management services.

## OVERT ACTS

59. In furtherance of the conspiracy, Defendant Henry and his co-conspirators committed one or more of the following overt acts.

60. On or about July 6, 2015, in Montgomery, and elsewhere, Defendant Henry and G.C. filed articles of incorporation with the Alabama Secretary of State to create

18

MyPractice24.

61. On or about December 4, 2015, Defendant Henry sent an email to A.P., who was, at that time, the office manager for Family Practice. A.P. received the message in Montgomery. The subject line of the message was "[Company A] Letter." It appeared that the purpose of the message was for Henry to transmit a draft letter he had written on behalf of Sanchez to Company A. The draft letter, had Sanchez adopted it, would have severed Family Practice's contractual relationship with Company A. The text of the email was as follows:

I wrote a letter similar to what [Physician A] wrote to them. He also harped on the fact that they did not deliver a patient portal as promised but I wasn't sure your clinic ever asked for that.

Ed Henry
Chief Executive Officer
. . . .

Attached to the email was a portable document format (PDF). That PDF file appeared to be the draft letter. At the top of the document was Family Practice's letterhead. The letter was addressed to the chief executive officer of Company A. The letter stated that Family Practice was terminating its agreement with Company A because, among other reasons, Company A's representatives never informed Sanchez and his employees that CMS required that a copay be charged for chronic care management services.

62. On or about January 22, 2016, an employee of Family Practice sent an email to the chief executive officer of Company A. The employee sent the email from Montgomery. Attached to the message was a PDF file. That PDF file consisted of a letter written under Sanchez's name to the Company A chief executive officer. The letter was a modified version of the one that Defendant Henry had sent to A.P. Like Henry's letter, the purpose of the January 22, 2016 letter was to sever the relationship between Family Practice and Company A.

19

However, the January 22, 2016 letter did not include the allegation that Company A's employees had not informed Sanchez of the copay requirement.

63. During in or about March through June of 2016, employees of Family Practice, acting in furtherance of the conspiracy described above, submitted claims to CMS for MyPractice24 providing chronic care management services to 411 of Family Practice's patients for the period covering the second quarter of 2016. The claims requested a total of $39,076.74. CMS subsequently paid a total of $21,682.24.

64. On or about May 9, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during March of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $3,852.00. Henry wrote the following message on the invoice: "MyPractice24 Inc. worked on over 300 patients but due to deductibles Family Practice received no payment on many of them. We only charge for what you get reimbursed." Family Practice subsequently remitted payment to MyPractice24.

65. On or about May 13, 2016, Defendant Henry sent, from his cellular telephone, a text message to C.U. Henry wrote, "I think Dr Sanchez authorized payment on out [sic] March patients. We only had 208 that paid so as soon as I get the check I'll send you a payment of $208. April should be closer to $300. By July it should be well over $500 at this rate."

66. On or about May 26, 2016, Defendant Henry sent, from his cellular telephone, a text message to C.U. Henry wrote, "My accounting software won't let me do a direct deposit on non employees. I'll mail your check Tuesday. Sorry about that." On or about May 30, 2016, Henry mailed or caused to be mailed a check to C.U.

20

67.     On or about June 1, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during April of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $4,024.08. Henry wrote the following message on the invoice: "Clinic received payment on 216 payment with an avg reimbursement of $30." On or about June 2, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

68.     On or about June 2, 2016, Defendant Henry sent, from his cellular telephone, a text message to C.U. Henry wrote, "I think we will get paid today for april's CCM so I'll get a check out to you next week for $216. June will be a little lower probably under $200. However June will be over $300 and July may be over $500 if we keep adding patients." Henry subsequently mailed or caused to be mailed a check to C.U.

69.     On or about July 15, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during March and May of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $3,165.55. Henry wrote the following message on the invoice: "This invoice is for May CCM Service and March services that the clinic collected after billing them again. There are about 80 for May that you should collect eventually but until you collect I won't invoice." On or about August 3, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

70.     During in or about June through September of 2016, employees of Family Practice, acting in furtherance of the conspiracy described above, submitted claims to CMS for MyPractice24 providing chronic care management services to 407 of Family Practice's

patients for the period covering the third quarter of 2016. The claims requested a total of $48,692.94. CMS subsequently paid a total of $31,957.71.

71. On or about August 5, 2016, Defendant Henry sent, from his cellular telephone, a text message to C.U. Henry wrote, "Great, we finally got paid for May, yesterday. I'll get a check out to you ASAP." On or about August 11, 2016, Henry sent another text message to C.U. In that message, Henry wrote, "We finally got paid for the 208 done in May. We had another 348 in June I'm hoping they will pay me for those this week and I'll get a check out to you Friday for $556[.]" Henry subsequently mailed or caused to be mailed a check to C.U.

72. On or about August 8, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during June of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $6,417.21. On or about August 18, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

73. On or about September 13, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during July of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $6,730.00. On or about September 22, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

74. On or about October 17, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during August of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $6,780.00. On or about October 24, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

75. During in or about September through December of 2016, employees of Family Practice and MyPractice24, acting in furtherance of the conspiracy described above, submitted claims to CMS for MyPractice24 providing chronic care management services to 411 of Family Practice's patients. The claims requested a total of $46,493.73. CMS subsequently paid a total of $30,603.92.

76. On or about December 3, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during September and October of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $6,860.00. On or about December 9, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

77. On or about December 9, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during October of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $5,409.25. On or about December 16, 2016, Family Practice remitted payment to MyPractice24, doing so by way of a credit card transaction.

78. On or about December 27, 2016, Defendant Henry sent, by email to employees of Family Practice, an invoice for chronic care management services rendered to Family Practice patients during November of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $6,624.00. On or about January 27, 2017, Family Practice remitted payment to MyPractice24 in the amount of $5,000.00, doing so by way of a credit card transaction. On or about March 10, 2017, Family Practice remitted payment to MyPractice24 in the amount of $1,624.00, doing so by way of a credit card transaction.

79. On or about February 13, 2017, Defendant Henry sent, by email to employees of

Family Practice, an invoice for chronic care management services rendered to Family Practice patients during December of 2016. The invoice was received in Montgomery. The invoice requested a total payment of $3,400. On or about March 20, 2017, Family Practice remitted payment to MyPractice24 in the amount of $3,519.00, doing so by way of a credit card transaction.

80.    On or about March 30, 2017, Defendant Henry sent, from his cellular telephone, a text message to Sanchez. Henry wrote, "Hello sir, [an employee of the Family Practice billing office] emailed and said you wanted to stop [chronic care management]. Because you didn't think it was financially beneficial to the clinic. We gave a 90 day out clause so I will begin the process of terminating your services. I'm curious as to why you aren't making a profit? You should be averaging $13-$16 dollars per patient pure profit."

81.    During in or about June of 2017, an employee of MyPractice24, acting in furtherance of the conspiracy described above, submitted claims to CMS for MyPractice24 providing chronic care management services to 312 of Family Practice's patients for the first quarter of 2017 and 229 of Family Practice's patients during the second quarter of 2017. The claims requested a total of $61,412.55. CMS subsequently paid a total of $33,930.36.

82.    On or about June 19, 2017, Defendant Henry sent, by email to employees of Family Practice, five invoices for chronic care management services rendered to Family Practice patients. One invoice covered January of 2017; another covered February of 2017; another covered March of 2017; another covered April of 2017; the last covered May of 2017. The invoices were received in Montgomery. The invoices collectively requested a total payment of $28,260.00. Family Practice did not pay any portion of this amount.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 THROUGH 6
### (Violation of the Anti-Kickback Statute)

83. The factual allegations contained in paragraphs 1 through 82 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

84. Beginning in or about July of 2015 and continuing through in or about June of 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

### WILLIAM E. HENRY,
### a/k/a "Ed,"

aided and abetted by others and aiding and abetting others, including but not limited to, Sanchez, did knowingly and willfully offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

85. The recipients of the remuneration were Sanchez, C.U., and Family Practice.

86. The individual or individuals referred in return for the paying of the below-described kickbacks were patients of Family Practice who were enrolled in the practice's chronic care management program.

87. The item and service furnished to these patients in return for the paying of the below-described kickbacks was chronic care management services provided by MyPractice24.

88. The remuneration offered and paid is as follows, with each form of remuneration giving rise to a separate count:

| COUNT | REMUNERATION |
|-------|--------------|
|       |              |

| 2 | The payments to C.U., the employee of Company B, of $1 per Medicare Part B beneficiary patient per month for which MyPractice24 was able to bill Family Practice for providing chronic care management services. |
| 3 | MyPractice24's deferral of submitting invoices to Family Practice from January of 2017 through June of 2017, so as to allow the practice to defer the submission of claims to CMS until after beneficiaries had paid their deductibles on other services. |
| 4 | The hiring of C.U. by MyPractice24 at Sanchez's request. |
| 5 | Defendant Henry's allowing C.U. to perform work for Family Practice unrelated to chronic care management services. |
| 6 | The non-invoicing for services rendered when CMS did not reimburse for such services, even if MyPractice24 was not at fault for CMS's decision to not pay a claim and even if full payment could have been obtained from a patient who owed a deductible. |

Each in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18,

United States Code, Section 2.

## COUNT 7

### (Violation of the Anti-Kickback Statute)

89. The factual allegations contained in paragraphs 1 through 88 of this Superseding

Indictment are realleged and incorporated herein as if copied verbatim.

90. From in or about July of 2015 and continuing through in or about June of 2017,

in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

WILLIAM E. HENRY,
a/k/a "Ed,"

aided and abetted by others and aiding and abetting others, including but not limited to,

Sanchez, did knowingly and willfully offer and pay any remuneration, including kickbacks

and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for

purchasing, leasing, ordering, and arranging for or recommending purchasing, leasing, and

26

ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

91. The recipients of the remuneration were Medicare Part B beneficiary patients of Family Practice who were enrolled in a chronic care management program.

92. The remuneration paid was the systematic waiver of copay obligations and other out-of-pocket costs associated with the receipt of chronic care management services. Sanchez and Family Practice paid this remuneration through the non-collection of copay and deductible money owed by the patients.

93. Defendant Henry aided and abetted Sanchez in paying this remuneration by charging Sanchez a below-market rate for chronic care management services, thus allowing Sanchez and Family Practice to profit from the furnishing of the service based solely on money paid by CMS.

94. The goods, facilities, services, and items ordered by the patients in return for the paying of the above-described kickbacks were chronic care management services provided by MyPractice24 under contract with Family Practice.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2.

**B.    Health Care Fraud Counts**

COUNT 8
(Conspiracy to Commit Health Care Fraud)

95. The factual allegations contained in paragraphs 1 through 94 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

96. Beginning in or about July of 2015 and continuing through in or about June of 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

27

defendant,

WILLIAM E. HENRY,
a/k/a "Ed,"

did knowingly and willfully conspire, combine, and agree with others, both known and

unknown, including Sanchez, to execute a scheme and artifice to defraud and to obtain, by means

of materially false and fraudulent pretenses, representations, and promises, money and property

owned and under the custody and control of health care benefit programs, as defined in Title 18,

United States Code, Section 24(b), in connection with the delivery of and payment for health

care benefits, items, and services, in violation of Title 18, United States Code, Section 1347. All

in violation of Title 18, United States Code, Section 1349.

## COUNTS 9 THROUGH 14
(Health Care Fraud)

97.    The factual allegations contained in paragraphs 1 through 96 of this Superseding

Indictment are realleged and incorporated herein as if copied verbatim.

## THE SCHEME

98.    Beginning in or about July of 2015 and continuing through in or about June of

2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

defendant,

WILLIAM E. HENRY,
a/k/a "Ed,"

aided and abetted by others and aiding and abetting others, including but not limited to, Sanchez,

did knowingly and willfully, with intent to defraud, devise and intend to devise, a scheme and

artifice to defraud, and to obtain, by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned and under the custody and control of a

health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is,

28

Medicare, in connection with the delivery of and payment for health care benefits, items, and services, those are, chronic care management services. The scheme and artifice is set forth below.

## MANNER AND MEANS

It was part of the scheme that:

99. Operating under a contract with Family Practice, Defendant Henry's company, MyPractice24, would provide chronic care management services to Medicare Part B beneficiary patients of Family Practice who were enrolled in the practice's chronic care management program.

100. At Defendant Henry's direction, MyPractice24 would charge Family Practice a below-market rate for providing these services to the Family Practice patients.

101. Based on this below-market rate, Sanchez and the employees of Family Practice could afford to waive and did not require patients to pay out-of-pocket costs associated with chronic care management, including copay obligations and deductibles.

102. Family Practice employees and MyPractice24 employees, all acting under the direction of Sanchez and Defendant Henry, would then submit claims to CMS requesting payment for the chronic care management services provided by MyPractice24. In submitting these claims, the employees of Family Practice and MyPractice24 would and did use the CPT code 99490. The use of this CPT code signaled to CMS an actual charge of approximately $40, including the copays. Thus, by using this code, the employees caused CMS to conclude that Family Practice had collected or was in the process of collecting copays from the patients to whom MyPractice24 provided the chronic care management services. As described above, Sanchez and the Family Practice employees had not, generally, collected copays. Thus, the use

29

of this CPT code was a false statement.

103.     Based on this false statement, CMS reimbursed Family Practice at a rate of approximately 80 percent of the actual charge reported for each claim. This equated to approximately $32 per claim. Had the employees of Family Practice and MyPractice24 correctly reported the non-collection of the copays, then CMS would not have reimbursed at this rate.

104.     In directing the employees of Family Practice and MyPractice24 to use the 99490 CPT code knowing that copay obligations had been waived, Defendant Henry acted with intent to defraud.

## THE CHARGES

105.     Between the dates set forth below, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

## WILLIAM E. HENRY,
a/k/a "Ed,"

aided and abetted by others and aiding and abetting others, including but not limited to, Sanchez, for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, money and property owned and under the custody and control of health care benefit programs, as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, did submit fraudulent claims for chronic care management during the below-described three month periods, with the claims submitted for each quarter giving rise to a separate count.

| COUNT | PERIOD COVERED | AMOUNT CLAIMED | AMOUNT PAID BY CMS | NUMBER OF PATIENTS SERVICED | NUMBER OF CLAIMS SUBMITTED |
|-------|----------------|----------------|--------------------|-----------------------------|----------------------------|
| 10    | Second quarter of | $39,076.74 | $21,682.24 | 411 | 894 |

30

| | 2016 | | | | |
|---|---|---|---|---|---|
| 11 | Third quarter of 2016 | $48,692.94 | $31,957.71 | 407 | 1,114 |
| 12 | Fourth quarter of 2016 | $46,463.73 | $30,603.92 | 411 | 1,037 |
| 13 | First quarter of 2017 | $33,307.02 | $15,138.19 | 312 | 762 |
| 14 | Second quarter of 2017 | $28,105.53 | $18,792.17 | 229 | 643 |

Each in violation of Title 18, United States Code, Section 1347 and Title 18, United States

Code, Section 2.

## C. Money Laundering Count

### COUNT 15
(Conspiracy to Commit Money
Laundering)

106. The factual allegations contained in paragraphs 1 through 105 of this Superseding

Indictment are realleged and incorporated herein as if copied verbatim.

107. Beginning on an unknown date and continuing until in or about June of 2016, in

Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

WILLIAM E. HENRY,
a/k/a "Ed,"

did knowingly combine, conspire, and agree with other persons known and unknown, including

Sanchez, to commit offenses against the United States in violation of Title 18, United States

31

Code, Section 1956.

## OBJECT OF THE CONSPIRACY

108. It was an object of the conspiracy to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, health care fraud, with the intent to promote the carrying on of that specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## MANNER AND MEANS

109. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following.

110. MyPractice24 and Family Practice employees, acting at the direction of Defendant Henry and Sanchez, would submit fraudulent claims to CMS for reimbursement for chronic care management services provided by MyPractice24 to Medicare Part B beneficiary patients of Family Practice. The claims were fraudulent in that they failed to report the waivers of copay obligations.

111. Based on these fraudulent claims, CMS remitted reimbursement payments to Family Practice. These monies constituted the proceeds of the specified unlawful activity of health care fraud.

112. Thereafter, Family Practice employees transferred to MyPractice24, by way of credit card payments, portions of the payments received from CMS. The Family Practice employees did so for the purpose of paying MyPractice24 for the provision of chronic care

32

management services provided to Family Practice's patients.

113.    Subsequently, Defendant Henry would write and cause to be written checks

payable to C.U., the employee of Company B. These checks were payable using funds received

from Family Practice, with those funds constituting the proceeds of the specified unlawful

activity of health care fraud.

114.    Defendant Henry would make these payments to C.U. for the purpose of

promoting the ongoing unlawful activity of health care fraud. By making these payments to

C.U., Henry incentivized C.U. to refer additional patients to the chronic care management

program and to ensure that patients did not seek to be removed from the program.

All in violation of Title 18, United States Code, Section 1956(h).

## IV. REDDY PRACTICE COUNT

COUNT 16
(Conspiracy to Defraud the United
States and to Pay and Receive Kickbacks in
Connection with a Federal Health Care Program)

115.    The factual allegations contained in paragraphs 1 through 114 of this

Superseding Indictment are realleged and incorporated herein as if copied verbatim.

116.    Beginning in or about August of 2015 and continuing through in or about

November of 2017, in Montgomery County, within the Middle District of Alabama, and

elsewhere, the defendants,

WILLIAM E. HENRY,
a/k/a "Ed," and
PUNURU J. REDDY,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly

combine, conspire, confederate, and agree with others known and unknown, to commit

offenses against the United States in violation of Title 18, United States Code, Section 371,

33

and Title 18, United States Code, Section 1320a-7b(b).

## OBJECTS OF THE CONSPIRACY

117.    It was an object of the conspiracy to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371.

118.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

119.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

120.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and

34

recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## MANNER AND MEANS

121.    The manner and means used to accomplish the objectives of the conspiracy included, among others, the following.

122.    In or about August of 2015, Defendant Reddy, on behalf of Reddy Practice, entered into an agreement with Defendant Henry's company, MyPractice24. Henry executed the agreement on behalf of MyPractice24. Under that agreement, MyPractice24 would provide chronic care management services to Medicare Part B beneficiary-patients of Reddy Practice. In return, Reddy Practice would pay MyPractice24 $22.60 per patient per month.

123.    Around the time that Defendant Henry and Defendant Reddy executed the above-described contract, Henry and Reddy discussed the possibility of patients having to pay out-of-pocket for chronic care management services. Henry told Reddy that patients would have to pay copays. Henry assured Reddy that a physician could "write off" a copay obligation if a patient refused to pay. Henry said that, to do so, all that Reddy would need to do would be to write "financial distress" on the patient's bill.

124.    Also around that time, Henry instructed Reddy that, in order to ensure that patients were not required to pay the full amount due for chronic care management, Reddy should refrain from submitting to CMS claims for reimbursement for chronic care management services until well after the beginning of each year—so as to allow patients to pay their annual deductibles on other services. To facilitate Reddy's doing so, Henry offered to delay invoicing Reddy Practice for chronic care management services until after CMS reimbursed the practice. Henry did not require that Reddy Practice or Reddy pay any interest or otherwise compensate

35

MyPractice24 for this deferred billing.

125. Beginning in or about August of 2015, MyPractice24 began to perform under the above-described contract. That is, employees of MyPractice24 began to enroll patients in the chronic care management program and to make telephone calls to the enrolled patients. The employees continued to provide chronic care management services from in or about August of 2015 through in or about November of 2017.

126. Soon thereafter, in or about the fall of 2015, Reddy Practice began sending bills to patients for the purpose of collecting monthly copays for chronic care management services. Many patients then came to the practice's office and complained about the bills. The patients stated that they did not wish to pay out-of-pocket for a service that did not include seeing or speaking with a physician.

127. Also in or about the fall of 2015, Defendant Reddy instructed the front desk staff at Reddy Practice to begin waiving copay obligations whenever patients came to the practice complaining about a chronic care management copay invoice. Reddy agreed to sign documentation to support each copay waiver.

128. At some point, Defendant Reddy grew tired of signing copay waiver documentation forms. Accordingly, he provided the practice's front desk staff with a stamp of his signature for use in preparing documentation for waiving copay obligations.

129. This documentation would be sent to the practice's outside billing company. The outside billing company would then submit claims on Reddy Practice's behalf for chronic care management services. On those claims, the billing company would certify that Reddy Practice had collected copays or made efforts to collect copays. Unbeknownst to the outside billing company, these statements were, in many instances, false. Reddy Practice had not made any

efforts to collect copays from the patients who had not paid copays.

130. From in or about January through in or about June of 2017, at Defendant Reddy's direction, Reddy Practice's outside billing company did not submit claims to CMS for chronic care management services provided by MyPractice24 to Medicare Part B beneficiary patients of Reddy Practice. Accordingly, from in or about January through in or about June of 2017, at Defendant Henry's direction, MyPractice24 did not submit any invoices to Reddy Practice. In June, the billing company submitted claims for chronic care management services provided between January and May of 2017. Only at that time did MyPractice24 submit invoices for those months to Reddy Practice.

131. In summary, Defendant Henry and Defendant Reddy and others conspired to and did impair, impede, obstruct, and defeat through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, by: (1) waiving copays for chronic care management services, thus creating the potential that patients obtained unnecessary services; and (2) submitting claims to CMS for chronic care management services that falsely reflected the actual charges for the chronic care management services. The claims were false in that they included, in the actual charges, the amount to be paid by the patients as copays. As Henry and Reddy and the co-conspirators then knew, in many instances, Reddy Practice was not collecting copays. These false claims induced CMS to pay more for the chronic care management services described in the claims than CMS would have paid had it known that the copays had been systematically waived.

132. In summary, Defendant Henry and Defendant Reddy and others conspired to and did knowingly and willfully offer and pay and solicit and receive remuneration, including

kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce Reddy to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare. The kickbacks paid by Henry and received by Reddy to induce the referral of patients of Reddy Practice to MyPractice24 for chronic care management services reimbursable by Medicare were MyPractice24's deferral of submitting invoices to Reddy Practice from January of 2017 through June of 2017, so as to allow Reddy Practice to defer the submission of claims to CMS until after beneficiaries had paid their deductibles on other services.

133.    In summary, Defendant Henry and Defendant Reddy and others conspired to and did knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare. The kickbacks paid by Reddy, Henry's co-conspirator, and received by the patients of Reddy Practice for the purchasing and ordering of chronic care management services reimbursable by Medicare included the systematically waived copay obligations for patients who did not have secondary insurance.

## OVERT ACTS

134.    In furtherance of the conspiracy, Defendant Henry and Defendant Reddy and other co-conspirators committed one or more of the following overt acts.

135.    On or about July 6, 2015, in Montgomery, and elsewhere, Defendant Henry and G.C. filed articles of incorporation with the Alabama Secretary of State to create

38

MyPractice24.

136.    Between in or about July of 2015 and in or about November of 2017, employees

of Reddy Practice transmitted to the practice's outside billing company copies documentation

indicating that Defendant Reddy had waived copays due to the patient's financial need, when

in fact Reddy had made no effort to collect the copays.

137.    On or about June 19, 2017, Defendant Henry sent, by email to employees of

Reddy Practice, five invoices for chronic care management services rendered to Reddy

Practice patients.  One invoice covered January of 2017; another covered February of 2017;

another covered March of 2017; another covered April of 2017; the last covered May of 2017.

The invoices collectively requested a total payment of $31,137.20.

All in violation of Title 18, United States Code, Section 371.

## IV. LEGACY MEDICAL COUNT

### COUNT 17
(Conspiracy to Defraud the United
States and to Pay and Receive Kickbacks in
Connection with a Federal Health Care Program)

138.    The factual allegations contained in paragraphs 1 through 137 of this

Superseding Indictment are realleged and incorporated herein as if copied verbatim.

139.    Beginning in or about July of 2015 and continuing through in or about October

of 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

defendants,

WILLIAM E. HENRY,
a/k/a "Ed," and
NICOLE D. SCRUGGS,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly

combine, conspire, confederate, and agree with others known and unknown, to commit

39

offenses against the United States in violation of Title 18, United States Code, Section 371, and Title 18, United States Code, Section 1320a-7b(b).

## OBJECTS OF THE CONSPIRACY

140. It was an object of the conspiracy to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371.

141. It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

142. It was an object of the conspiracy to violate Title 42, United States Code, Section 1320-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

143. It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in

kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## MANNER AND MEANS

144. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following.

145. In or about December of 2016, Defendant Henry contacted Defendant Scruggs regarding forming a business relationship through which Henry's company, MyPractice24, would provide chronic care management services to patients of Legacy Medical on behalf of Scruggs. When he explained MyPractice24's business model to Scruggs, Henry advised Scruggs that she would not need to collect copays from patients.

146. In or about December of 2016, Defendant Scruggs entered into an agreement with Defendant Henry's company, MyPractice24. Henry executed the agreement on behalf of MyPractice24. Under that agreement, MyPractice24 would provide chronic care management services to Medicare Part B beneficiary-patients of Legacy Medical. In return, Legacy Medical would pay MyPractice24 $23.00 per patient per month, provided that CMS reimbursed for services provided to that patient during the relevant month.

147. Under the agreement, if CMS did not reimburse for services provided to that patient, then Legacy Medical would owe nothing for those services, even if MyPractice24 was not at fault for CMS's decision to not pay a claim and even if payment in full could have been obtained from a patient who owed a deductible. If CMS reimbursed at a rate of $23.00 or less, then Legacy Medical would only owe the amount of the reimbursement, even if MyPractice24 was not at fault for CMS's decision to pay only a partial reimbursement.

41

148. Also under the agreement, Defendant Henry agreed to station an employee of MyPractice24 in Defendant Scruggs's office. That employee would be responsible for enrolling patients in the practice's chronic care management program and for providing chronic care management services to the patients once they enrolled. MyPractice24 would pay the entirety of the employee's salary. Nevertheless, Henry advised Scruggs that Scruggs would be permitted to use the MyPractice24 employee to perform clinical work not related to chronic care management.

149. From in or about February of 2017 through in or about November of 2017, an employee of MyPractice24, A.S., worked in Scruggs's office and provided chronic care management services to Scruggs's patients. During this time, A.S. also spent significant amounts of time doing work at Scruggs's direction that was unrelated to chronic care management. Henry knew that the employee was doing so. Nevertheless, MyPractice24 paid the entirety of A.S.'s salary.

150. From in or about February of 2017 through in or about November of 2017, Defendant Scruggs, in most instances, waived copay obligations for chronic care management for patients who did not have secondary insurance. Scruggs then submitted claims to CMS for reimbursement for chronic care management services. In those claims, Scruggs did not disclose the systematic waivers of copay obligations.

151. In summary, Defendant Henry and Defendant Scruggs and others conspired to and did impair, impede, obstruct, and defeat through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, by: (1) waiving copays for chronic care management services, thus creating the potential that patients obtained unnecessary services;

42

and (2) submitting claims to CMS for chronic care management services that falsely reflected the actual charges for the chronic care management services. The claims were false in that they included, in the actual charges, the amount to be paid by the patients as copays. As Henry and Scruggs and the co-conspirators then knew, in many instances, Legacy Medical was not collecting copays. These false claims induced CMS to pay more for the chronic care management services described in the claims than CMS would have paid had it known that the copays had been systematically waived.

152. In summary, Defendant Henry and Defendant Scruggs and others conspired to and did knowingly and willfully offer and pay and solicit and receive remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce Scruggs to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare. The kickback paid by Henry and received by Scruggs to induce the referral of patients of Legacy Medical to MyPractice24 for chronic care management services reimbursable by Medicare was Henry's allowing A.S. to do work for Legacy Medical unrelated to chronic care management.

153. In summary, Defendant Henry and Defendant Scruggs and others conspired to and did knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare. The kickbacks paid by Scruggs, Henry's co-conspirator, and received by the patients of Legacy Medical for the purchasing and

ordering of chronic care management services reimbursable by Medicare included the

systematically waived copay obligations for patients who did not have secondary insurance.

## OVERT ACTS

154. In furtherance of the conspiracy, Defendant Henry and Defendant Scruggs and

other co-conspirators committed one or more of the following overt acts.

155. On or about July 6, 2015, in Montgomery, and elsewhere, Defendant Henry and

G.C. filed articles of incorporation with the Alabama Secretary of State to create

MyPractice24.

156. On or about December 9, 2016, Defendant Henry sent an email to Defendant

Scruggs. In that email, Henry wrote,

Cost and Revenue:

You pay nothing until you are reimbursed. You will never pay me more than you collect. Your patients will have a 20% copay if they do not have secondary insurance. The copay will be around $8.

Most of my clinics average around $36 per patient not chasing the copay. The ones that require the copay are at $39 per patient.

By February we should have 300+ patients enrolled, you will profit around $13 each which will earn you an extra $4000 per month ($48,000 per year) plus give you an extra employee handling those patients.

157. On or about December 22, 2016, Defendant Henry and Defendant Scruggs

executed the above-described contract under which MyPractice24 would provide chronic care

management services to Scruggs's patients.

158. On or about January 13, 2017, A.S. reported for work at Legacy Medical.

MyPractice24 paid her salary. That day, she met Defendant Scruggs.

159. On or about February 27, 2017, A.S. worked for MyPractice24 at Legacy

Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

44

160. On or about March 1, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

161. On or about March 2, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

162. On or about March 6, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

163. On or about March 7, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

164. On or about March 8, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

165. On or about March 21, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the triage nurse. MyPractice24 paid her salary.

166. On or about March 27, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she helped train a new employee of Legacy Medical. MyPractice24 paid her salary.

167. On or about March 28, 2017, A.S. worked for MyPractice24 at Legacy Medical. That day, she filled in for the secretary. MyPractice24 paid her salary.

All in violation of Title 18, United States Code, Section 371.

## V. GENERAL CONSPIRACY COUNT

### COUNT 18
(Conspiracy to Defraud the United
States and to Pay and Receive Kickbacks in
Connection with a Federal Health Care Program)

168. The factual allegations contained in paragraphs 1 through 167 of this Superseding Indictment are realleged and incorporated herein as if copied verbatim.

169. Beginning in or about July of 2015 and continuing through in or about

45

November of 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

WILLIAM E. HENRY,
a/k/a "Ed,"
PUNURU J. REDDY, and
NICOLE D. SCRUGGS

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown, including Sanchez, to commit offenses against the United States in violation of Title 18, United States Code, Section 371, and Title 18, United States Code, Section 1320a-7b(b).

## OBJECTS OF THE CONSPIRACY

170.    It was an object of the conspiracy to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371.

171.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

172.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in

kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

173.    It was an object of the conspiracy to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## MANNER AND MEANS

174.    The manner and means used to accomplish the objectives of the conspiracy included, among others, the following.

175.    Defendant Henry would and did provide remuneration to physicians, including Defendant Reddy, Defendant Scruggs, and Sanchez for the purpose of inducing those physicians to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

176.    Defendant Reddy, Defendant Scruggs, and Sanchez, aided by Defendant Henry, would and did provide remuneration, through waived copay obligations, to persons to induce such persons to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare. The good, facility, service, and

47

item at issue was chronic care management services.

177. Defendant Reddy, Defendant Scruggs, and Sanchez, aided by Defendant Henry, would and did impair, impede, obstruct, and defeat through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare, by: (1) waiving copays for chronic care management services, thus creating the potential that patients obtained unnecessary services; and (2) submitting and causing to be submitted claims to CMS for chronic care management services that falsely reflected the actual charges for the chronic care management services. The claims were false in that they included, in the actual charges, the amount to be paid by the patients as copays.

## OVERT ACTS

178. In furtherance of the conspiracy, Defendant Henry, Defendant Reddy, Defendant Scruggs, Sanchez and other co-conspirators committed one or more of the following overt acts.

179. Any of the overt acts alleged in paragraphs 59 through 82 of Count 1 of this Superseding Indictment.

180. Any of the overt acts alleged in paragraphs 134 through 137 of Count 16 of this Superseding Indictment.

181. Any of the overt acts alleged in paragraphs 154 through 167 of Count 17 of this Superseding Indictment.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION-1

A. The allegations contained in Counts 1 through 7 and 16 through 18 of this

superseding indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(5) and (7).

B.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 371, 1347 and 1349; and Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and (B), set forth in Counts 1 through 7 and 16 through 18 of this superseding indictment, the defendants,

WILLIAM E. HENRY a/k/a "Ed,"
PUNURU J. REDDY; and,
NICOLE D. SCRUGGS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(5) and (7), any and all property constituting or derived from proceeds said defendants obtained directly or indirectly as a result of the offenses in violation of Title 18, United States Code, Sections 371, 1347 and 1349; and Title 42, United States Code, Section 1320a-7b(b)(1)(A) and (B). The property includes, but is not limited to, a Forfeiture Money Judgment.

C.     If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendants:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third party;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be
        divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 982(a)(5) and (7).

## FORFEITURE ALLEGATION-2

A.     The allegations contained in Count 15 of this superseding indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1).

B.     Upon conviction of the offenses in violation of Title 18, United States Code, Section 1956(h) set forth in Count 15 of this superseding indictment, the defendant,

### WILLIAM E. HENRY a/k/a "Ed",

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property constituting or derived from proceeds defendant obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offenses in violation of Title 18, United States Code, Section 1956(h). The property includes, but is not limited to, a Forfeiture Money Judgment.

C.     If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant:

> (1)     cannot be located upon the exercise of due diligence;
>
> (2)     has been transferred or sold to, or deposited with, a third party;
>
> (3)     has been placed beyond the jurisdiction of the court;
>
> (4)     has been substantially diminished in value; or
>
> (5)     has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

50

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL:

_____
Foreperson

_____
LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY

_____
Jonathan S. Ross
Assistant United States Attorney

_____
Brandon W. Bates
Assistant United States Attorney

_____
R. Randolph Neeley
Assistant United States Attorney